IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:20-CR-59-TSE |
| | ) | |
| MANISH SINGH, | ) | Trial: October 20, 2020 |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S TRIAL BRIEF**

The Government submits this trial brief to provide the Court with an overview of the evidence that the Government will seek to admit at trial, to explain in advance the bases for the admission of some of that evidence, and to flag for the Court's attention potential issues that may arise during the course of the trial.

**I.      Procedural Background**

The Defendant was indicted on February 27, 2020, on charges of wire fraud (Counts 1–4), inducing interstate travel to defraud (Count 5), and identity theft (Count 6) in connection with a fraudulent investment scheme. His trial is currently scheduled to begin on October 20, 2020.

The indictment alleges that the Defendant entered into an agreement with two victims (a married couple) to create a business that would design and sell fabrics. The business was to be called Sanaa Home and Lifestyle (hereinafter "Sanaa"). The victims were to provide the capital for the business, and the Defendant was to contribute his expertise and contacts in the fabric industry.

The Defendant represented to the victims that their money was being used for numerous expenses related to Sanaa. First, he told the victims that he was using their investments to pay

contract employees, and to pay for expenses related to the manufacture of the fabric in India. Later in the scheme, the Defendant told the victims that their fabric was being successfully sold to brand-name companies in the United States, and that he was rolling over the returns on their investments to fulfill new fabric orders. Based on the Defendant's misrepresentations, the victims gave the Defendant approximately $1.26 million for the Sanaa joint business venture.

In reality, the Defendant was using the victims' money almost entirely for personal expenses, mostly to view live pornography online. None of the victims' money was ever returned.

## II.     The Government's Evidence

The Government anticipates that it will present the following witnesses and evidence at trial to prove the above allegations.

### A.     Victims 1 and 2[1]

Victims 1 and 2 will testify to the communications they had with the Defendant about Sanaa, which included many emails, phone conversations, and text messages. The Government will offer into evidence a critical selection of these communications, including emails from the Defendant to Victims 1 and 2 containing very specific and detailed representations. For example, the Defendant sent the victims a spreadsheet in which he kept track of each of the victims' payments to him, together with his explanations for what each payment was used for, such as "contract work," "fabric transportation costs," etc. In this same spreadsheet, the Defendant summarized the expenses in his own words as follows:

> [T]he costs incurred in this Sanaa venture has [sic] gone into fabric development by the factories, investment in the super cotton and fire retardant fabric and the hours to research fabric trends, design the fabrics and contact work and

---

[1] During the trial, the Government will refer to Victims 1 and 2 by their actual names, or together by the husband's last name. The usual practice of using the victims' initials is not practicable here because their initials happen to be identical.

> communicate with all the drop shippers and companies that will be on the Sanaa Lifestyle website[.]

In other emails, the Defendant told the victims that their money was being used to pay specifically identified contractors who were supposedly working hundreds of hours on Sanaa; that more money was needed to send to "all the indian [sic] partners for the development" of the fabric; and that Sanaa's fabrics had been successfully imported and sold to a number of specifically identified corporate clients. The Defendant provided documents to Victims 1 and 2 to corroborate these statements, such as spreadsheets tracking the hours worked by the contractors, and invoices for Sanaa's sales of fabric to the clients.

Victims 1 and 2 will further testify that when the promised returns on their investments did not materialize, the Defendant told them that he was rolling over their returns into new investments, in order to meet new fabric orders that were being placed with Sanaa. Towards the end of the scheme, the Defendant told Victims 1 and 2 that all of their money was tied up in a massive unpaid $2 million invoice sent to a company called B&J Fabrics. The Defendant provided the victims with a fake email address for S.C., the owner of B&J Fabrics, and the victims corresponded with someone at that address. A select number of those emails will be introduced through the victims.

### B.     The Contractors

The Defendant told Victims 1 and 2 in writing that their money was being used to pay specific contractors working for Sanaa. He sent the victims multiple emails describing the contractors' work hours, and requesting money from the victims in order to pay these contractors.

The Government will call some of these contractors as witnesses at trial. With the exception of two individuals, who together received approximately $12,000 from the Defendant,

these witnesses will testify that they were not paid any money for the work they performed for the Defendant, some of which was completely unrelated to Sanaa.

### C.     The Clients

The Defendant provided Victims 1 and 2 with the names of various corporate clients to whom Sanaa had supposedly sold its fabric, together with the invoices for these alleged sales. The Government will call representatives of these client companies to testify that no such invoices exist in their business records, and that they have no record of ever having purchased any fabric from Sanaa or the Defendant.

The Government anticipates that one such client company, Scalamandre, will refuse to comply with the Court's subpoena. The company's Chief Executive Officer and majority owner made quite clear that neither he nor any of his employees would appear to testify, stating: "You need to respect my wishes in this matter." If the company fails to comply, the Government will request that the Court issue a bench warrant for a separate criminal contempt proceeding pursuant to 18 U.S.C. § 401(3) and Federal Rules of Criminal Procedure 17(g) and 42(a), which vest the Court with inherent power to "punish . . . such contempt of its authority . . . as [d]isobedience or resistance to its lawful writ[ or] process . . . ." 18 U.S.C. § 401(3). Such a proceeding should not require any kind of continuance or otherwise interfere with the trial.

### D.     The Identity Theft Victim

The Defendant eventually told Victims 1 and 2 that all of their money was tied up in a $2 million order placed by a company called B&J Fabrics, and provided the victims with multiple documents purporting to corroborate this claim. The Defendant also gave Victims 1 and 2 a business email address for B&J Fabrics' owner, S.C., which the victims used to correspond with an individual they believed to be S.C.

The Government will call S.C. to testify that he has never placed any orders with Sanaa or the Defendant; that the email address used to correspond with Victims 1 and 2 is not his email address and is not associated with his company, B&J Fabrics; and that he never corresponded with the victims, nor did he authorize anyone else to impersonate him in such correspondence. The Government will introduce evidence later in the trial showing that the Defendant created the fake email address himself, and used it to correspond with Victims 1 and 2 while impersonating S.C.

### E. The FBI Witnesses

Finally, the Government will call a number of witnesses from the Federal Bureau of Investigation (FBI).

#### 1. Forensic Accountant

Forensic Accountant Gary Frazier reviewed the bank accounts controlled by the Defendant. The Government will introduce through Mr. Frazier a series of summary exhibits pursuant to Federal Rules of Evidence 1006 and 611(a).

Rule 1006 allows for the introduction of a "summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. Its purpose is "to reduce the volume of written documents that are introduced into evidence by allowing in evidence accurate derivatives from the voluminous documents." *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004) (internal citation omitted).

The charts that will be offered pursuant to Rule 1006 accurately summarize otherwise admissible underlying records, namely, the financial records for the bank accounts controlled by the Defendant.[2] They include all of the inflows and outflows from the relevant accounts during

---

[2] The Government will separately address in this memorandum the Rule 902(11) certifications that make these underlying records otherwise admissible as business records.

the relevant time period, and account for all of the activity in the bank records, not just a select number of transactions. They are therefore admissible under Rule 1006. *See, e.g.*, *id.* at 272; *United States v. Oloyede*, 933 F.3d 302, 310 (4th Cir. 2019).

A different chart will chronologically show (1) all of the inflows from Victims 1 and 2 to the Defendant's account, together with the Defendant's own written representations as to what those funds would be used for, and (2) the 1,330 explicitly identifiable outflows from that same account to the adult entertainment website, in a summarized form. This chart, while narrower in focus than the charts described above, is also admissible pursuant to Rule 1006 because it includes every one of these two types of transactions that are contained in one and a half years' worth of bank statements. It is therefore distinguishable from the charts found to be inadmissible under Rule 1006 in *Oloyede*, which only included "selected deposits . . . consistent with the government's theory of which deposits were tied to illegal activity." *Oloyede*, 933 F.3d at 310.

Nevertheless, in an abundance of caution, the Government will elect to seek admission of this chart pursuant to Rule 611(a) instead of Rule 1006. Rule 611(a) contemplates the use of charts in order "to facilitate the presentation and comprehension of evidence already in the record." *Janati*, 374 F.3d at 273; *see Oloyede*, 933 F.3d at 311. In considering admissibility under Rule 611, the touchstone is "whether the summary chart aids the jury in ascertaining the truth." *United States v. Johnson*, 54 F.3d 1150 (4th Cir. 1995). This chart directly serves that purpose by showing that the Defendant's repeated demands for more money were interspersed with uncontrovertibly fraudulent spending of that money, which is relevant to the Defendant's intent to defraud. It is therefore clearly admissible under Rule 611(a).

The Government believes that Mr. Frazier should be considered a lay witness, as his testimony in this case does not require any technical or other specialized knowledge. Nevertheless,

out of an abundance of caution, the Government will separately provide an expert notice to the Defendant for Mr. Frazier's testimony, including the proposed summary exhibits, so that the Defendant may have sufficient time to examine them and raise any objections prior to trial.

### 2. Seizing Agent, CART Examiner, and CAST Agent

A search warrant was executed at the Defendant's residence during the course of the Government's investigation. The Government will call the seizing agent who took custody of the Defendant's laptop during this search, as well as the Computer Analysis Response Team (CART) examiner who processed the laptop, to testify to the laptop's chain of custody.

On August 28, 2020, the Government sent the Defendant final versions of two proposed stipulations. One stipulation concerned the wires charged in Counts 1 through 4. The Defendant has chosen not to stipulate, as is his right under the Constitution. The Government will therefore call an agent from the Cellular Analysis Survey Team (CAST) to testify that each of Counts 1 through 4 constituted a wire or radio signal in interstate commerce.

The Government will separately provide expert notices to the Defendant for both witnesses.

### 3. Lead Agent

Finally, the Government will call one of the two FBI agents who investigated this matter (the "lead agent"). The lead agent will explain certain aspects of the forensic accountant's summary charts. The agent will further describe some of the relevant steps taken in the investigation, and will introduce evidence found during a search of the Defendant's home, including a limited number of documents found on the Defendant's laptop.

The lead agent will also tell the jury about the Defendant's detailed and voluntary confessions, in which the Defendant stated that he had "defrauded" Victims 1 and 2. Among other things, the Defendant admitted to the investigating agents that he had used the victims' money to

"tip" a performer on an adult entertainment website, and showed the agents how to identify these payments on his financial statements.  The Defendant also confessed to using the victims' money to purchase a Lexus and to pay his rent.  The Defendant further admitted that he created the email account from which he sent emails to the victims impersonating the owner of B&J Fabrics, and that he had fabricated all of the documents (including the bank deposit slips and the invoices) that he sent to the victims to corroborate his false statements about the non-existent fabric orders.

### F.     902(11) Certifications

As mentioned above, the Government previously sent the Defendant two proposed stipulations, which he has declined to sign.  The second stipulation pertained to business records, and was intended to eliminate the necessity of calling witnesses to lay the foundation, under Rules 803 and 901 of the Federal Rules of Evidence, for the authenticity and status as business records of various financial documents and communications records.  The financial documents in question are the underlying bank records summarized by the FBI forensic accountant in his charts, as discussed above.  The other documents—telephone toll records and email subscriber information—constitute stand-alone trial exhibits that will be introduced through other witnesses.

Rather than compel custodial witnesses to appear in person at trial, the Government intends to rely on certifications of admissibility under Federal Rule of Evidence 902(11) to satisfy the foundational requirements for these records to be used at trial.  The certifications, underlying records, and notices of intent to rely upon the certifications have been provided to the Defendant.  Such certifications do not implicate the Confrontation Clause, and the Fourth Circuit has upheld their use.  *See, e.g.*, *United States v. Mallory*, 461 F. App'x 352, 356–57 (4th Cir. 2012); *United States v. Thomas*, 128 F. App'x 986, 992–93 (4th Cir. 2005).  The Government will file these certifications separately in advance of trial.

### III. Conclusion

The Government will be prepared to address any questions the Court may have about this memorandum at the pre-trial conference on October 16, 2020, or earlier if the Court so desires.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:   /s/ Grace L. Hill
Grace L. Hill
Heidi Boutros Gesch
Assistant United States Attorneys
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
grace.hill@usdoj.gov
heidi.gesch@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2020, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send electronic copies to all counsel of record.

Respectfully submitted,

By:   /s/ Grace L. Hill
Grace L. Hill
Counsel for the United States